OPINION
{¶ 1} Appellant Larry D. Bruce appeals his conviction for murder in the Court of Common Pleas, Richland County. The appellee is the State of Ohio. The relevant facts leading to this appeal are as follows.
 {¶ 2} In early November 1978, appellant's wife Judy Bruce died as a result of asphyxia by smothering. The Bruce family at that time resided in a house on Lindaire Lane in Ontario, Ohio. During the early morning hours of Thursday, November 2, 1978, appellant's and Judy's son LeRoy Bruce, then age thirteen, heard in the house the sound of pill bottles being knocked over and noises consistent with Judy gasping for breath. As the daylight hours commenced on November 2nd, Judy did not get up to assist LeRoy and his sister Melody Bruce to get ready for school, as was her normal routine. Appellant on that morning directed the children to stay out of the marital bedroom and not disturb Judy, explaining that she was ill. LeRoy nonetheless either briefly entered or looked into the bedroom and saw appellant in bed with Judy, whom he did not observe moving or speaking. LeRoy also observed appellant lying under the covers but wearing boots at that time.
 {¶ 3} Sometime between 1 AM and 3 AM on November 2, 1978, Jim Rogers, a firefighter and part-time farmer, was on his way home after working late on the farm, when he noticed a "large, full-size car" parked on a road near the entrance to an area Girl Scout camp. Rodgers later identified the vehicle, appellant's Cadillac, when law enforcement officials took him to the parking lot of appellant's employer. Another area resident, Mary Hoffman, who lived near the camp, recalled seeing a large car heading toward the camp entrance in the late afternoon of November 2nd, at a time when the facility would have been closed.
 {¶ 4} Judy's body was found on Friday, November 3, 1978, at the wooded edge of a dry creek bed at the Girl Scout camp. The body, barefoot and in pajamas, was wrapped with a "moving pad" — type blanket, which was later identified by LeRoy and Melody as coming from the family's garage. Appellant reported Judy missing and telephoned her employment supervisor of her absence that day, prior to being informed by law enforcement officials that the body had been located. Appellant was questioned by Ontario village police and Richland County Sheriff Deputies on the afternoon of November 3, 1978. Appellant consented to a search of his home. Some of the officers noted that portions of the Bruce marital bed and bedding material were soaked with urine. Fiber testing of the moving blanket later showed a consistency with the trunk lining in appellant's Cadillac.
 {¶ 5} No charges were brought forth in 1978 or in the two decades thereafter. In 1999, a special "unsolved crimes" investigative unit, led by Investigator Scott Reinbolt, formed to assist the Richland County Prosecutor, reviewed the matter. Appellant agreed to testify before the Richland County Grand Jury. The grand jury, on January 10, 2002, indicted appellant for the murder of Judy Bruce, over twenty-three years after the date of the charged offense. On March 8, 2002, appellant filed a motion to dismiss for delay in prosecution and a motion to exclude the testimony of Leroy Bruce and Melody Bruce based on the state's failure to preserve taped statements the two then-minors gave police in early 1979. On March 27, 2002, appellant filed a motion to suppress any evidence seized from the Bruce home and his Cadillac, claiming an unlawful search. In addition, the prosecutor filed a notice of intent to introduce appellant's 1982 sexual battery conviction into evidence, as well as an intent to use the testimony of Melody Bruce pertaining to sexual abuse allegations against appellant. On April 10, 2002, in response thereto, appellant filed a motion in limine to exclude Melody's testimony and the 1982 conviction.
 {¶ 6} On April 23, 2002, the trial court granted the motion to suppress as to statements made by appellant after he requested an attorney, and any statements made to his wives during his subsequent marriages. On May 1, 2002, the trial court overruled appellant's motion to exclude the testimony of Melody Bruce and Jim Rogers, the firefighter and farmer mentioned above, and ruled that appellant's 1982 sexual battery conviction could not be used for impeachment purposes.
 {¶ 7} The matter proceeded to a trial by jury on May 14-17, 2002. The state first called LeRoy Bruce, appellant's son. He was thirteen years old in November 1978. According to his recollection, appellant worked at Roadway Trucking as a driver at that time, and owned a turquoise 1972 Cadillac four-door. LeRoy's usual weekday pattern was to leave for the school bus at about 7:15 AM, which meant he was ordinarily the first household member to leave. Judy generally made breakfast for LeRoy and Melody and "most all of the time" at least got up and made sure they were ready for school. Tr. at 363. Melody would then catch her bus about an hour later, with appellant leaving for work at about the same time. On Wednesday, November 1, 1978, the day before the disappearance, Judy spent the day at home fighting the flu. LeRoy recalled that he, Melody, and Judy all went to bed prior to appellant coming home. LeRoy awoke at about 3 AM, early Thursday morning, to use the bathroom, when he heard the noise of medicine bottles "fumbling around" or "banging around," as well as heavy breathing sounds, coming from his parents' bedroom. Tr. at 371-372. Assuming his mother was getting up to get medicine, LeRoy went back to bed. As noted above, LeRoy looked in at Judy as he was leaving and saw her lying with her back towards him, but appellant forbade him to say anything or kiss her goodbye. When he arrived home from school that afternoon, Judy was gone. The marital bed was made, which was generally only done on "housecleaning" days. Tr. at 376. Judy's mother called the house, and later showed up, naturally worried. LeRoy recalled appellant coming home at approximately 7:45 PM, urging the family to go to nearby Lexington, Ohio, to view a motor home they were considering to purchase. Despite Judy's absence, the group made the trip. Upon their return later that evening, the Ontario Police were called and came to the house to take a report.
 {¶ 8} LeRoy, during his testimony, also recalled periodic prior episodes of domestic violence, indicating that Judy, even standing just under five feet tall, was "a pistol" and would not back down from appellant's challenges. Tr. at 364. On one occasion, appellant threw her down the basement steps at the Lindaire house. On an earlier occasion, a disagreement led to Judy setting appellant's boat on fire, to which he responded by kicking in the front door. Other instances included appellant once locking Judy in the cellar, and Judy once throwing an ashtray at appellant, breaking one of his fingers. LeRoy also heard an argument one night over appellant's friendship with a woman named Mich. Davey, who was pursuing a divorce from her husband at the time of Judy's death. Appellant had accompanied Mich. on her daughter's school outing to the Cedar Point amusement park, to which Judy responded by trying to break down the door to a bedroom in which appellant had locked himself, according to LeRoy.
 {¶ 9} Dennis Reid then took the stand. Reid in 1978 was an Ontario police officer. On the evening of November 2, 1978, Reid went to the Bruce home to take the missing persons report. He did a quick walk-through of the house, but cannot recall looking at the marital bedroom. He noticed Judy's car, a Mercury Bobcat, still in the garage. He recalled seeing no signs of forced entry or items missing from the house. He felt at the time that the situation "just didn't add up," in consideration of the lack of signs of forcible entry and hearing no reports of a lightly clad woman wandering outside. Tr. at 428-429. The Ontario dispatch officer directed two patrol officers in separate cruisers to check out the area as best they could; however, nothing was found. Reid further testified appellant told him he had not seen Judy since approximately 8:30 AM that morning.
 {¶ 10} Ronald Dille, one of the officers dispatched to check out the immediate area around the Bruce home in 1978, asserted that he was and is a "traditional" hunter and tracker in his spare time, but that he and the other officer found "absolutely nothing" that night after checking for tracks in the fields and culverts near the house. Tr. at 455.
 {¶ 11} Evidence was then presented that Judy's body was found by a maintenance worker at the Girl Scout camp during the late morning or early afternoon of Friday, November 2, 1978. The body, still in pajamas, was wrapped in a moving blanket later identified by LeRoy Bruce as coming from the garage of the Bruce home. Ontario Police Chief Tim McClaran, a patrol officer in 1978, recalled seeing no dirt or mud on Judy's body, in particular none on her feet, indicating she most likely did not walk to the creek bed area of the camp. McClaran also noted limestone gravel was used on the driveway into the camp. Former Ontario Police Chief Robert Krauss, a captain in 1978, went to the Bruce home just prior to the discovery of the body. Appellant went with him as he looked around inside the house, especially to see if Judy had perhaps hid herself in the house and committed suicide. Appellant told him it was "no use" looking in the bedroom, but Krauss nonetheless at least looked in, noting the bed was made. Overall, Krauss noticed nothing suspicious in or around the house at that time. Shortly after returning to the station, Krauss received the report that Judy's body had been found. Krauss dispatched Ontario police officer Bemiller to bring appellant in for questioning. Appellant at first waived his right to speak to an attorney, and consented to a search of his home.[1] Krauss then returned to the Bruce home. When he threw the covers back, he noticed a large amount of urine under the covers and saturating the mattress. Krauss had photographs taken of the bedding, which were maintained and entered into evidence at trial. The bedding itself was also bagged and collected. He also seized a pair of black boots with mud on them. Also taken were the trunk liner from appellant's Cadillac, three leaves in the trunk, and a bowling ball (with carrying bag), rope, and cable in the trunk. After BCI testing, the Sheriff's Department became responsible for custody of the evidence.
 {¶ 12} Gus Frontz, who in 1978 was a Richland County deputy, testified that he noted scratch marks on appellant's neck, which appellant attributed to an electric razor. Appellant told him what Judy was wearing and further that he knew there was no other clothing missing from the house. The confidence expressed in appellant's latter comment struck Frontz as "odd." Tr. at 583.
 {¶ 13} Jim Rogers, the aforecited fireman and part-time farmer who drove past the Girl Scout camp sometime after midnight on November 2, 1978, also testified as a prosecution witness. He placed the time of his observance of a "large, full-sized" automobile sitting near Walker Lake Road at between 1 AM and 3 AM. His twenty-four hour fire department shift started on Thursday, November 2, 1978, at 7 AM, so he had worked very late in order to catch up on his farm duties before his shift. He was also able to tie the date to a fire report "run sheet" showing an aircraft emergency he responded to at the Mansfield airport on November 2, 1978. When an officer later drove Rogers past appellant's employee lot, Rogers "immediately saw the car and picked the car out before [the officer] even said anything." Tr. at 652.
 {¶ 14} Dr. Elizabeth Balraj, Cuyahoga County Coroner, handled the autopsy in 1978. She noted that Judy's bladder was empty, a phenomenon which very often occurs with asphyxial death. She likewise observed urine stains on Judy's pajamas. Judy's body showed postmortem "scrapes" to her forehead and left forearm. She was able to rule out strangulation or a lung or bronchial infection as a cause of death. There was no presence of drugs or alcohol in Judy's system, other than a prescription level of Propoxafeen, ruling out death by poisoning. Dr. Balraj concluded the cause of death was asphyxia by smothering, and labeled the death a homicide.
 {¶ 15} All told, the state presented over thirty witnesses. A botanist was called to testify, in relation to the oak leaf found in the Cadillac's trunk, that he could find no oak trees in the vicinity of the Bruce home or the Roadway Trucking facility, although they were numerous near the Girl Scout camp entrance. Car dealer Tony Parella, a few years prior to the trial date, was showing off a 1997 Cadillac he was driving, when he heard appellant comment that one could "put a body" in the car's large trunk. Tr. at 824. Frank Myers, Judy's uncle, testified to visiting the Bruce home about two weeks before Judy's death. He recalled appellant telling him that he had tried to kill Judy, whom he labeled "the little bitch," by throwing her down the stairs, but that she "was hard to kill." Tr. at 829. Investigator Reinbolt recounted his work on the case, which included an experiment to place and remove a female volunteer into a Cadillac trunk similar to appellant's, providing a theory as to the postmortem scrapes on Judy's body. Finally, Melody Bruce, eleven years old in 1978, recounted the events surrounding her mother's disappearance. She further related that appellant had sexually abused her prior to Judy's death, and that Judy became aware of the situation by catching appellant in the act prior to the family's move to Lindaire Avenue.
 {¶ 16} At the conclusion of the trial, the jury returned a verdict of guilty on the murder charge against appellant. The trial court rendered a judgment entry on May 17, 2002, sentencing appellant to a sentence of fifteen years to life imprisonment.
 {¶ 17} Appellant filed a notice of appeal on June 13, 2002, and herein raises the following five Assignments of Error:
 {¶ 18} "I. The Trial Court Committed Plain And Prejudicial Error By Denying Appellant His Due Process Rights Under The Fifth AndFourteenth Amendments Of The United States Constitution And Section 16, Article I Of The Ohio Constitution As A Result Of The Length Of The Pre-indictment Delay, And By The Courts (SIC) Failure To Sustain The Defendant Appellant's Motion To Dismiss.
 {¶ 19} "II. The Trial Court Committed Prejudicial Error, And Denied Appellant His Right To Due Process Under The United States And Ohio Constitutions, And Under The Ohio Rules Of Evidence, By Receiving Into Evidence Testimony Regarding Appellant's Sexual Abuse Of His Stepdaughter.
 {¶ 20} "III. The Trial Court Erred In Overruling The Appellant's Motion To Suppress And/or Motion In Limine Regarding The Testimony Of Leroy Bruce And Melody Bruce Nka Phillips In Violation Of The Due Process Clause Of The Fifth And Fourteenth Amendments Of The United States Constitution.
 {¶ 21} "IV. Appellant Was Deprived Of Effective Assistance Of Counsel By (SIC) The Sixth Amendment Of The United States Constitution And Article I Section 10 Of The Ohio Constitution, As Well As The Due Process Protection Under The Fourteenth Amendment Of The United States Constitution And In Article 1 Section 16 Of The Ohio Constitution.
 {¶ 22} "V. The Court Erred As A Matter Of Law In Holding That Although The Defendant Was Indigent, Nevertheless, He Was Required To Pay Back To The Court Any Counsel Fees Incurred As A Part Of His Defense."
 I. {¶ 23} In his First Assignment of Error, appellant contends he was deprived of his constitutional right to due process because of the length of pre-indictment delay. We disagree.
 {¶ 24} Statutes of limitations provide the primary guarantee against bringing overly stale criminal charges. United States v. Marion
(1971), 404 U.S. 307, 322, 92 S.Ct. 455, 30 L.Ed.2d 468. However, statutes of limitations do not fully define a defendant's rights with respect to events occurring prior to indictment. Marion at 324. The Due Process Clause does play a limited role in protecting against oppressive pre-indictment delay. U.S. v. Lovasco (1977), 431 U.S. 783,97 S.Ct. 2044, 52 L.Ed.2d 752. See, also, State v. Luck (1984), 15 Ohio St.3d 150,154, 472 N.E.2d 1097. In Lovasco, the United States Supreme Court set forth a two-part test to determine whether a defendant has been denied due process as the result of pre-indictment delay. A defendant has the burden of establishing that the delay resulted in actual prejudice to the defendant. Once the defendant has established actual prejudice, the burden shifts to the State to justify the delay. See, also, State v.Whitting (1998), 84 Ohio St.3d 215, 702 N.E.2d 1199. Should a defendant not be able to establish actual prejudice, a court need not consider the reasons for the delay. State v. Dawson (Nov. 18, 1993), Cuyahoga App. No. 63122. When reviewing a trial court's decision regarding a motion to dismiss an indictment based upon a pre-indictment delay, a reviewing court must accord due deference to the trial court's findings of fact, but may freely review the trial court's application of the law to the facts. State v. Cochenour (March 8, 1999), Ross App. No. 98CA2440, citingState v. Metz (Apr. 21, 1998), Washington App. No. 96CA48.
 {¶ 25} Appellant makes the following claims relating to physical evidence in support of his argument that he was prejudiced by the pre-indictment delay occurring from late 1978 to early 2002: (1) a taped statement and transcript of Leroy Bruce's interview taken by Captain Krauss of the Ontario Police on January 7, 1979, was subsequently lost; (2) another taped statement and transcript of Melody Bruce taken by Captain Krauss of the Ontario Police on January 8, 1979, was likewise subsequently lost; (3) a taped statement from Judy Bruce's mother, Edna Leadingham (now deceased), taken by Deputy Frontz on November 5, 1978, concerning conversation between Edna and appellant, was also lost; (4) fingernails scrapings obtained from Judy's hands by the Cuyahoga County Coroner's Office were lost; (5) the soil remnants from appellant's boots were inadvertently thrown away by a crew cleaning a county building; (6) gloves were apparently lost and then rediscovered with the truck liner of appellant's car; (7) one of the three tree leaves found in the trunk of appellant's car is missing; (8) Judy's pajamas were contaminated with foreign blood at the Cuyahoga County Coroner's Office, (9) hair and fiber evidence from the marital bed is no longer useful due to the passage of time and changing age of potential suspects, and (10) the vaginal and rectal swabs from Judy's body were not usable for DNA testing due to spoilation by mounting slide chemicals.
 {¶ 26} Appellant also argues that four witnesses for the defense have become unavailable: (1) Edna Leadingham, Judy's mother, is now deceased; (2) Judy's brother, Robert "Junior" Phillips who purportedly went with appellant to search for Judy on the evening of November 2, 1978, is also deceased; (3) Myrtle Ullum, Junior's wife, who also went with appellant to search that evening, apparently suffers from mental retardation problems and no longer has any memory of the event, and; (4) Donald Braggs, who worked at the Girl Scout camp in 1978, is now deceased.
 {¶ 27} Certainly, the determination of actual prejudice involves "a delicate judgment based on the circumstances of each case." Marion at 325, 92 S.Ct. 455, 30 L.Ed.2d 468. Having reviewed the totality of the claimed prejudices articulated by appellant above, we are unable to find that appellant has sufficiently demonstrated prejudice pursuant to Lovasco and Luck, supra. For example, despite the unfortunate loss of the tapes of LeRoy and Melody's 1979 interviews, both of these individuals, closest to the events of November 1978, proved to be competent present-day witnesses, and Captain Krauss' notes of his investigation provided buttressing documentation for said interviews. Like the trial court, which cogently addressed each specific claim in its judgment entry overruling the motion to dismiss, we come to the conclusion upon review that the bulk of appellant's arguments as to the effect of the delay rise only to the level of speculation. See United States v. Greer (D.Vt. 1997), 956 F. Supp. 525, 528 (stating that a defendant must present concrete proof of actual prejudice and not mere speculation of actual prejudice). Accordingly, we need not address the question of whether the state justified its preindictment delay.
 {¶ 28} Appellant's First Assignment of Error is therefore overruled.
 II. {¶ 29} In his Second Assignment of Error, appellant contends he was deprived of his constitutional right to due process due to the trial court's allowance of Melody's testimony concerning sexual abuse perpetrated against her by appellant. We disagree.
 {¶ 30} The admission or exclusion of evidence rests in the sound discretion of the trial court. State v. Sage (1987), 31 Ohio St.3d 173,180. As a general rule, all relevant evidence is admissible. Evid.R. 402; cf. Evid.R. 802. Our task is to look at the totality of the circumstances in the case sub judice, and determine whether the trial court acted unreasonably, arbitrarily or unconscionably in allowing the disputed evidence. See State v. Oman (Feb. 14, 2000), Stark App. No. 1999CA00027. Evid.R. 404(B) states: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." In light of the entire record in the case sub judice, we hold it was within the trial court's discretion to allow into evidence Melody's abuse testimony for the purpose of proving the possible motives of appellant of (1) eliminating Judy's future interference with appellant's molesting behaviors, or (2) eliminating Judy's possible utilization of this knowledge should their often dysfunctional marriage fall apart. Appellant alternatively argues that the evidence's probative value was outweighed by its potentially prejudicial effect. See Evid.R. 403(A). However, in light of the voluminous trial testimony presented, we find no merit in appellant's position.
 {¶ 31} Appellant's Second Assignment of Error is therefore overruled.
 III. {¶ 32} In his Third Assignment of Error, appellant argues the trial court erred in denying his motion to suppress and/or his motion in limine pertaining to the testimony of LeRoy and Melody based on the loss of the tapes and transcripts from their 1979 police interviews. We disagree.
 {¶ 33} Appellant herein raises an issue of similar import to that of dated evidence brought about by preindictment delay; namely, evidence lost or thrown away as a result of the passage of time. However, this Court has consistently held that the burden of proof is on the defendant to show the exculpatory nature of destroyed evidence. See State v.Birkhold, Licking App. No. 01CA104, 2002 WL 727154; State v. Hill, Stark App. No. 1998CA00083, 1999 WL 174921; State v. Blackshear, Stark App. No. CA-7638, 1989 WL 66650. The state's failure to preserve potentially useful evidence violates a defendant's due process rights only when the police or prosecution act in bad faith. State v. Lewis (1990),70 Ohio App.3d 624, 634, 591 N.E.2d 854. The term "bad faith" generally implies something more than bad judgment or negligence. "It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another." Hoskins v. Aetna Life Ins. Co. (1983), 6 Ohio St.3d 272, 276,452 N.E.2d 1315 (Citation omitted).
 {¶ 34} Upon review of the record, we are unable to find a demonstration of bad faith by appellant such to warrant reversal on due process grounds. Appellant's Third Assignment of Error is overruled.
 IV. {¶ 35} In his Fourth Assignment of Error, appellant contends that he was denied the effective assistance of counsel at trial, and thus was denied his rights under the Sixth Amendment and his right to due process. We disagree.
 {¶ 36} Our standard of review is set forth in Strickland v.Washington (1984), 466 U.S. 668. Ohio adopted this standard in the case of State v. Bradley (1989), 42 Ohio St.3d 136. These cases require a two-pronged analysis in reviewing a claim for ineffective assistance of counsel. First, we must determine whether counsel's assistance was ineffective; whether counsel's performance fell below an objective standard of reasonable representation and was violative of any of his essential duties to the client. If we find ineffective assistance of counsel, we must then determine whether or not the defense was actually prejudiced by counsel's ineffectiveness such that the reliability of the outcome of the trial is suspect. This requires a showing that there is a reasonable probability that but for counsel's unprofessional error, the outcome of the trial would have been different. Id. Trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. State v. Sallie (1998),81 Ohio St.3d 673, 675.
 {¶ 37} Appellant raises the following areas of alleged ineffective assistance: (1) failure to object to alleged hearsay statements during the examination of Chief McClaran, Chief Krauss, Deputy Frontz, and Investigator Reinbolt; (2) failure to object to Melody's testimony regarding childhood sexual abuse; (3) failure to cross-examine Melody on her testimony regarding childhood sexual abuse; (4) failing to object to testimony of appellant's past treatment of Judy; and (5) failure to object to the prosecutor's reference to appellant during closing arguments as "a flirt, * * * a playboy, * * * a habitual gambler, * * * a child molester, and * * * a wife beater."
 {¶ 38} In regard to the testimony of the police officers, we note the state called seven different law enforcement officials, not including Reinbolt and other investigators and criminalists. We note that a great deal of the testimony overlapped, such that the alleged hearsay was often repeated by a non-hearsay source. We are unpersuaded that trial counsel failed to provide reasonable representation on this point. Tactical or strategic trial decisions, even if ultimately unsuccessful, do not generally constitute ineffective assistance. State v. Carter (1995),72 Ohio St.3d 545, 558. As to the testimony of Melody, we find no merit in appellant's position per our conclusions in appellant's Second Assignment of Error. In regard to trial counsel's allowance of appellant's prior treatment of Judy, even allowing for some foundational and background use, we believe counsel's performance fell below an objective standard of reasonable representation. However, we find the significant amount of circumstantial evidence tying appellant to the crime in this case would negate any possible demonstration of a reasonable probability that the outcome of the trial would have been different, but for counsel's unprofessional error. Finally, concerning the closing argument issue, we note a prosecutor's conduct during trial cannot be grounds for error unless the conduct deprives the defendant of a fair trial. State v. Apanovitch (1987), 33 Ohio St.3d 19, 24. The isolated closing comments cited by appellant would be in our minds insufficient to demonstrate prosecutorial misconduct; hence appellant's ineffective assistance argument must fail on this point as well.
 {¶ 39} Accordingly, Appellant's Fourth Assignment of Error is overruled.
 V. {¶ 40} In his Fifth Assignment of Error, appellant argues the trial court erred as a matter of law in ordering appellant to pay counsel fees after previously finding him indigent. We disagree.
 {¶ 41} R.C. 120.33(A)(4) reads in pertinent part: "The fees and expenses approved by the court shall not be taxed as part of the costs and shall be paid by the county. However, if the person represented has, or may reasonably be expected to have, the means to meet some part of the cost of the services rendered to the person, the person shall pay the county an amount that the person reasonably can be expected to pay. ***" In State v. Trembly (2000), 137 Ohio App.3d 134, 145, 738 N.E.2d 93, the Court noted in regard to R.C. 120.33: "The assessment of attorney fees is analogous to a restitution order. Purported indigency does not affect assessment though it may affect collection."
 {¶ 42} It is undisputed that appellant owns real property. We find no error as a matter of law in requiring repayment of fees under these circumstances. Appellant's Fifth Assignment of Error is overruled.
 {¶ 43} For the reasons stated in the foregoing opinion, the judgment of the Court of Common Pleas, Richland County, Ohio, is hereby affirmed.
Boggins, J., concurs. Edwards, J., concurs separately.
[1] Appellant later asked to speak to counsel, at which time the questioning was curtailed.